UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § § | |
| v. | § | NO. EP-17-CR-1566-PRM |
| | § § | |
| DANIEL TERRAZAS-AGUIRRE | § § | |

**DEFENDANT'S BRIEF IN SUPPORT OF
RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL**

TO THE HONORABLE PHILIP R. MARTINEZ, DISTRICT JUDGE OF THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS:

COMES NOW Defendant DANIEL TERRAZAS-AGUIRRE ("Mr. Terrazas"), by and through counsel, and files a Brief in support of his oral motion for judgment of acquittal. He respectfully urges the Court to grant the motion given the insufficient evidence that the substance found in the vehicle driven by Mr. Terrazas was, in fact, a controlled substance and that Mr. Terrazas knew he was in possession of it.

### I.    RELEVANT PROCEDURAL BACKGROUND

Mr. Terrazas was charged in a one-count Indictment for possession of a detectable amount of marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(D). (ECF No. 15.) The jury was empaneled on October 11, 2017, and the evidence began on October 12, 2017. *See* (ECF Nos. 59, 68). After the Government rested, Mr. Terrazas made an oral motion for judgment of acquittal, arguing in part that there was insufficient evidence that the bundles taken from the minivan were marijuana and there was insufficient evidence that Mr. Terrazas knew marijuana was in the vehicle. (Transcript of Trial Vol. I (Oct. 12, 2017) at 203, ECF No. 70

[hereinafter, "Trans. Vol. I"].) The Court denied the motion with the understanding that it would have an opportunity to revisit it. (*Id.* at 207.)

Mr. Terrazas rested and renewed his motion for judgment of acquittal. (*Id.* at 208.) He also moved to have the testimony of the chemist stricken as irrelevant, and the Court did so. *See* (*id.* at 213-14; Transcript of Trial Vol. II (Oct. 13, 2017) at 3, ECF No. 71 [hereinafter, "Trans. Vol. II"]). The Court reserved ruling on the motion for judgment of acquittal, submitted the case to the jury, and stated that the parties would have until October 27, 2017, to submit additional briefing in the event of a guilty verdict. (Trans. Vol. II at 10.) After over six hours of deliberation, the jury found Mr. Terrazas guilty. *See* (Trans. Vol. II at 57; ECF No. 67).

## II.     RELEVANT TESTIMONY AND EVIDENCE ADMITTED AT TRIAL

On July 29, 2017, at approximately 8:30 a.m., Mr. Terrazas approached the Sierra Blanca Checkpoint driving a 2008 Chrysler Town and Country minivan. *See* (Trans. Vol. I at 107-08). At that time, U.S. Border Patrol Agent Cortez was working preprimary operations with his assigned canine, Lady. *Id.* at 108. Cortez testified that Lady is "[t]rained to detect the odors of marijuana, cocaine, heroin, meth, and Ecstasy, and also detect the concealed humans." *Id.* at 107; *see id.* at 125. Lady alerts to all of this contraband odor in the same manner. *Id.* at 125. Cortez confirmed that Lady has alerted when no contraband is found in the vehicle, but that is not necessarily considered a false alert because, even if no contraband was found, "[t]here could be odor, and it is what she is trained to detect, the odor, and not find the substance." *Id.* at 127. Thus, if she alerts and no contraband is found, it is "[p]ossible there could have been drugs there before" because the odor stays in the car. *Id.* at 127-28.

Agent Cortez testified that Lady alerted to the minivan driven by Mr. Terrazas and followed it to where it came to a complete stop. *Id.* U.S. Border Patrol Agent Jesus Ovalle conducted an

immigration inspection with Mr. Terrazas in primary and noticed no signs of nervousness during their two-minute conversation. *Id.* at 40, 54-56, 62. Agent Ovalle did not smell any marijuana when he looked inside the vehicle. *Id.* at 62. Nevertheless, he referred Mr. Terrazas to the secondary inspection area based on Cortez's signal. *Id.* at 40, 42-43. In secondary, Agent Cortez testified that Lady alerted to the side door, which he opened so that she could go in. *Id.* at 112. According to Cortez, Lady was looking for the source of the odor inside the minivan; eventually she "pinpoint[ed] to the hinges" attaching the bench seat to the floorboard. *Id.* at 112-13. Lady did not alert to Mr. Terrazas, even though she would alert to someone carrying or using an illegal drug. *Id.* at 129.

Agent Cortez assisted in the search of the minivan and, after the carpet was peeled back and the trapdoors opened, saw bundles of what the agents assumed was marijuana in the compartment. *Id.* at 114, 119. Cortez, who claimed to be familiar with the odor of marijuana, said he could "smell it a little bit after the trapdoors were removed[.]" *Id.* at 119; *see id.* at 131. He did not smell marijuana before the trapdoors were open. *Id.* at 130. He helped remove the 91 bundles, which were wrapped in PVC tape and clear plastic. *Id.* at 119, 138; *see* Gov't Exs. 4G, 4H, 4J. The bundles weighed 99 pounds. *Id.* at 119. "Some were placed immediately outside of the door, trapdoor where we found them and then put them in an orange bin to be able to take them inside of the checkpoint." *Id.* at 115. Cortez "took them inside, . . . helped weigh the bundles, and . . . conducted a field test of the bundles which revealed marijuana." *Id.* at 114. Cortez stated that the field test was positive for marijuana, but he did not describe how many bundles were tested, what type of test was used, or the accuracy of the test. *Id.* No one testified about what the substance looked like inside of the bundles, and the pictures only show tape- and plastic-wrapped bundles. *See* Gov't Exs. 4G, 4H, 4J.

Mr. Terrazas never admitted to knowing any contraband was in the minivan, even though agents told him he could face significant time in prison if he did not confess. *See id.* at 187. There was no evidence of Mr. Terrazas's fingerprints or DNA on any part of the minivan's carpet, foam, or trapdoors, or on any of the bundles. *See id.* at 137-38. Mr. Terrazas had approximately $3,318 in cash with him, but there is no evidence that this money was illegally procured. *See id.* at 49, 79.

Mr. Terrazas told agents he had a bad heart and had borrowed the minivan to go visit his brother in Houston and go fishing. *See id.* at 45, 75, 166, 171. Agent Ovalle testified that Mr. Terrazas said the owner of the minivan was someone named Hernandez but also said that he borrowed the van from a friend.[1] *See id.* at 45-46, 167. Ovalle also testified that Mr. Terrazas first said he met the owner of the van at a bar but then said they met at his house and then at a hotel. *Id.* at 47, 87. This conversation was not recorded, and the agents did not inquire about where he met the owner of the van or friend during the recorded interrogation. *See id.* at 48; Gov't Exs. 7-8. In Mr. Terrazas's recorded interrogation, he also said that a woman owned the minivan and that he borrowed the van from a friend, Jose Luis Lopez. Gov't Exs. 7-8.

During the interrogation, Mr. Terrazas claimed that he had not been through the checkpoint in years. *Id.* at 150; Gov't Exs. 7-8. The Government introduced pictures of the same minivan going through the checkpoint on July 15 and 22, 2017. *Id.* at 150-41; Gov't Trial Exs. 2A, 2B. U.S. Border Patrol Agent Jose Perez testified that the July 22 picture is blurry, but he still could tell it is of Mr. Terrazas based on the facial triangle, the fact that he has eyebrows and a nose. *Id.* at 176, 178, 192-93. He could not identify Mr. Terrazas from the July 15 photograph. *Id.* at 179.

---

[1] The minivan was registered to a Ms. Hernandez. Trans. Vol. I at 86.

4

After being shown the photographs during the interrogation, Mr. Terrazas denied that he was depicted in them. Gov't Exs. 7-8.

The Government's final witness, U.S. Border Patrol Agent Jesus Otero, testified that, days after the arrest, he stood between Mr. Terrazas and a female detainee for her safety after Mr. Terrazas began speaking to the female. *Id.* at 198-99. Otero testified that Mr. Terrazas commented that he "got caught with his hands in the cookie jar." *Id.* Otero had no idea what Mr. Terrazas meant by that statement. *Id.* at 201.

### III.    LEGAL ARGUMENT

The Court should grant Mr. Terrazas's motion because, construing all evidence in a light most favorable to the Government, the Government did not prove all of the elements of the crime beyond a reasonable doubt. *See* FED. R. CRIM. P. 29(a)-(b); *United States v. Lucio*, 428 F.3d 519, 522 (5th Cir. 2005). This standard does not require a substantial or grave doubt. *Victor v. Nebraska*, 511 U.S. 1, 5 (1994). Rather, if evidence falls short of "proof of such a convincing character that [one] would be willing to rely and act upon it *without hesitation* in making the *most important decisions* of [one's] own affairs," then the Government has not met its burden. 5TH CIR. PATTERN JURY INSTRUCTIONS § 1.05 (2015) (emphasis added). Indeed, proof beyond a reasonable doubt "'is proof that leaves you firmly convinced of the defendant's guilt.'" *Victor v. Nebrask*, 511 U.S. 1, 27 (Ginsburg, J., concurring in part and in judgment (quoting Federal Judicial Center, Pattern Criminal Jury Instructions 17-18 (instruction 210))).

The proof introduced against Mr. Terrazas falls short of this standard. As such, the motion for judgment of acquittal must be granted.

### A. A Rational Jury Would Reasonably Doubt Whether the Substance Was Marijuana.

The Government did not present any evidence about what the substance in the bundles looked like.[2] Nor did it present evidence of Mr. Terrazas being part of a long-running conspiracy to possess and distribute marijuana or being connected to any individuals who were involved in such a conspiracy. There was no evidence that someone familiar with that substance itself, not just the odor emanating from the compartment, knew it to be marijuana.

When such circumstantial evidence was present, the Fifth Circuit has in some cases found that it was sufficient to prove beyond a reasonable doubt that something was a controlled substance. In *Osgood*, there was "overwhelming evidence of Osgood's cocaine trafficking involvement" and a witness, who had used cocaine previously and was familiar with its effects, testified that he used a substance given to him by Osgood and "the substance produced by Osgood was cocaine" based on it inducing "the euphoric feeling with which [he] had associated his past cocaine use." *United States v. Osgood*, 794 F.2d 1087, 1089-90, 1095 (5th Cir. 1986). In *Crisp*, two witnesses testified that "the defendants referred to the white powder they were handling as 'coke' or 'cocaine,' and snorted it"; one witness snorted some himself; and the "defendants cut the substance, weighed it, tested it over a flame and under a microscope, and sold it for substantial sums of money." *United States v. Crisp*, 563 F.2d 1242, 1244 (5th Cir. 1977); *see also United States v. Bell*, 237 F. App'x 942, 943 (5th Cir. 2007) (finding "ample circumstantial and lay evidence to show that the substance involved was crack cocaine" where two witnesses "testified that they purchased crack from Bell; the price they paid was consistent with the going price of

---

[2] The prosecutor stated in his closing argument that the substance "looked like marijuana" and was a "green, leafy substance," but there was no such evidence presented to the jury that was not stricken. Trans. Vol. II at 37-38; *see* Trans. Vol. I at 100 (chemist's stricken testimony confirming that he was provided a sample of a green, leafy substance").

crack; [and] there was evidence that on at least one occasion, Bell prepared crack consistent with testimony regarding how crack is prepared").

Similarly, in *Quesada*, there was evidence that the defendant "was intimately involved" in transactions during which "the substance was continuously referred to as the 'very best' heroin in his presence and described by him as heroin in his conversations with others"; the substance was "a white powder" and sold to him on both occasions for substantial sums of money, and the defendant then resold it for even more money. *United States v. Quesada*, 512 F.2d 1043, 1045 (5th Cir. 1975). In *Brown*, witnesses experienced in identifying cocaine testified that "substantial sums of money were paid" for the substance, "it was carefully tested and weighed" after delivery and "then divided into smaller amounts and packed in plastic sandwich bags . . . distributed to various crack houses where it was eventually resold." *United States v. Brown*, 887 F.2d 537, 542 (5th Cir. 1989). "Evidence of this continuing pattern was sufficient for the jury to conclude that the substance involved was in fact cocaine." *Id.*

Here, the Government did not present any evidence that Mr. Terrazas was involved in a trafficking scheme other than that he was stopped at the checkpoint with a substance it claims to have been marijuana hidden in a compartment. The agents had the names of the owner of the minivan and the person who leant it to Mr. Terrazas, but they did not link those people to any broader drug trafficking organization. *Compare with Osgood*, 794 F.2d at 1095. The Government did not call any witnesses to whom Mr. Terrazas had sold or given drugs nor was there any other evidence about transactions. *Compare with Quesada*, 512 F.2d at 1045. There was no evidence of anyone using the substance or any effects thereof. Nor did the Government present any evidence of what the substance in the bundles looked like, even though the bundles were in its possession and handled by its witnesses. *Compare with id.* at 1045.

The evidence of the substance being marijuana was limited to the odor and the field test. But the odor was linked to the trapdoor compartment, not necessarily to the bundles secreted therein. The agents did not notice a marijuana smell until the trapdoors were open, and even then it was faint. Trans. Vol. I at 119. Agent Cortez testified that the odor could have been from drugs being secreted in the minivan previously. *Id.* at 125, 127. And the canine alert was not even specific to marijuana; the canine alerts the same regardless of the type of contraband odor it detects, and this odor could be for a variety of drugs or concealed humans, or residual odors from any of the above. *Id.* at 125.

Agent Cortez testified that the field test was positive for marijuana, but he did not describe what he tested. *Id.* at 114. Ninety-one bundles were taken from the minivan. It is unknown whether Cortez tested one, some, or all of those bundles. Nor did Agent Cortez describe that test or its reliability. This evidence falls short of evidence leaving the jury firmly convinced that the substance was marijuana. *See Victor*, 511 U.S. at 27.

### B. A Rational Jury Would Reasonably Doubt Whether Mr. Terrazas Knew There was Marijuana Concealed in the vehicle

Additionally, even construing evidence in a light most favorable to the Government, it failed to establish beyond a reasonable doubt that Mr. Terrazas knew the marijuana was in the minivan. "A jury may ordinarily infer a defendant's knowledge of the presence of drugs from his control over the vehicle in which they are found." *United States v. Villarreal*, 324 F.3d 319, 322-25 (5th Cir. 2003). However, if the contraband is hidden in a secreted compartment, as it was here, additional circumstantial evidence of knowledge is required that is suspicious in nature or demonstrates guilty knowledge. *Id.*

Mr. Terrazas exhibited no signs of nervousness when he was questioned before the bundles were discovered. The agents could not smell marijuana until the trapdoor, which was below carpet

8

and foam, was opened. The canine did not alert to Mr. Terrazas at all, indicating he had not handled contraband. No evidence was introduced that Mr. Terrazas communicated with known drug smugglers or handled the trapdoor or the bundles. Despite having the information and ability to do so, the agents did not attempt to corroborate or disprove Mr. Terrazas's statements about having a heart condition, being in poor health, or going to visit his brother in Houston and go fishing. According to Agent Ovalle, Mr. Terrazas contradicted himself about who lent him the minivan and where he met those people. The agents did not follow up on those supposed contradictions, however, during the recorded interrogation. And Mr. Terrazas's statement that a woman named Hernandez owned the minivan was corroborated by the title. A rational trier of fact could not identify the person in the checkpoint photos from July 15 and 22 as Mr. Terrazas, and a rational trier of fact would not interpret the cookie jar comment as an admission of guilt given that it was made days after his arrest in the context of speaking with a female detainee. The statements Agent Ovalle claimed he made do not constitute proof beyond a reasonable doubt of Mr. Terrazas's guilt.

  Because the Government failed to prove beyond a reasonable doubt that Mr. Terrazas knew he was in possession of marijuana, the Court should grant the motion for judgment of acquittal.

## IV.  CONCLUSION

WHEREFORE, Mr. Terrazas prays the Court grant his motion for judgment of acquittal and any further relief as may be just.

Respectfully Submitted,

MAUREEN SCOTT FRANCO
Federal Public Defender


           /S/
SHANE MCMAHON
Assistant Federal Public Defender
Western District of Texas
Richard C. White Federal Building
700 E. San Antonio, D-401
El Paso, Texas  79901
(915) 534-6525
*Attorney for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of October, 2017, I electronically filed the foregoing with the Clerk of Courts using the CM/ECF system which will send notification of such filing to the following: AUSA Christopher K. Mangels, Office of the U.S. Attorney, Richard C. White Building, 700 E. San Antonio, Suite 200, El Paso, TX 79901.

           /S/
SHANE MCMAHON
*Attorney for Defendant*
